UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
"IN ADMIRALTY"

Case No. 12-80596-Civ-Brannon

ST. MICHAEL PRESS PUBLISHING
COMPANY, INC.,

      Plaintiff,

vs.

ONE UNKNOWN WRECK BELIEVED
TO BE THE ARCHANGEL MICHAEL,
A MILITARY AND SALVAGE FRIGATE
OF THE VESSEL MARAVILLA, its apparel,
tackle, appurtenances and cargo located within
designated coordinates, in rem,

      Defendant.
_____/



## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

THIS CAUSE is before the Court on Plaintiff's Motion for Summary Judgment (DE 61). The State of Florida has responded in opposition (DE 62)[1] and Plaintiff has replied (DE 63). Being duly advised in the premises, the Court declines to grant summary judgment based on: (1) the presence of genuine issues of disputed material fact regarding the actual existence of the alleged wreck; and (2) if the wreck exists, whether Spain has effectively refused Plaintiff's salvaging services.

---

[1] In its reply, Plaintiff correctly notes that the State of Florida's response was filed two days past deadline. While the better practice would have been for the State of Florida to move for an extension of time after conferring with Plaintiff's counsel, the Court accepts the response as timely filed.

1

## BACKGROUND

This suit involves an unidentified shipwreck (the *res*) that is allegedly located off the coast of Palm Beach County in U.S. territorial waters (Am. Compl. ¶ 8). Plaintiff—a Florida corporation engaged in marine salvage activity—claims to have extensively surveyed the area where the *res* is located (Id. at ¶¶ 4-5). Plaintiff believes the *res* to be the *Archangel Michael*, a Spanish military frigate wrecked for over 200 years that has not been abandoned by its original owner, the Kingdom of Spain (Am. Compl. at ¶¶ 1, 9, 11). Plaintiff bases this belief on its alleged possession of "secret Spanish salvage records" showing that "some artifacts recovered from the Juno Beach site can be matched to the cargo man[i]fest of the *Maravillas* proving the *Archangel Michael* was one of four Spanish military and salvage frigates of the *Maravillas*" (DE 57 at 3). According to an artifact log provided by Plaintiff, items recovered from the area include precious stones, bronze, a wine bottle, silver coins, a silver wedge, and a silver spike (DE 57 at 4).

Invoking the Court's admiralty jurisdiction, Plaintiff filed this *in rem* action seeking (1) a full salvage award based on its rescue of the *res*, and (2) an injunction barring any rival salvors from conducting salvage operations within the designated area (Am. Compl. at ¶¶ 30-39).[2] Soon after the case was filed, relying on Plaintiff's allegations, the Court issued a warrant for the arrest of the *res* and appointed Plaintiff as substitute custodian (DE 16 & DE 22). On October 26, 2012, Plaintiff published notice of this case in the Palm Beach Daily Business Review (DE 26-1).

---

[2] In the Amended Complaint, Plaintiff also sought exclusive title to the *res* under the law of finds (Am. Compl. at ¶¶ 27-29). Plaintiff has since abandoned this alternative claim (DE 51 at 3).

On November 6, 2012, Florida appeared "for the limited purpose of asserting Eleventh Amendment immunity and seeking dismissal" of this case (DE 29). Florida thereafter sought dismissal, arguing that to the extent the *res* belongs to Spain, it is not abandoned, and Spain has expressly refused salvage; otherwise, Florida is the rightful owner of the *res* and the Eleventh Amendment precludes the Court from exercising jurisdiction (DE 42).

On July 17, 2013, the Court denied Florida's motion to dismiss on grounds that Florida lacked the authority to invoke a jurisdictional challenge under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602-11, and because, under binding Eleventh Circuit precedent, Florida could not avail itself of the Eleventh Amendment without having actual possession of the *res* (DE 56). In its decision denying the motion to dismiss, the Court noted "the premature nature of the parties' briefing concerning the proper owner of the *res*, whether the [Abandoned Shipwreck Act, 43 U.S.C. §§ 2101–06] applies to this dispute, and—assuming the vessel belongs to Spain as alleged by Plaintiff—the circumstances under which the Kingdom of Spain may be deemed to have abandoned the vessel." (Id. at 7).

To date, Spain has not appeared or otherwise made any claim in this matter. However, correspondence filed by Plaintiff reveals that Plaintiff's president, Mr. Robert Bouchlas, visited Spain's Ministry of Culture in early December of 2012 (DE 42-1). Following this meeting, on December 17, 2012, Spain's legal counsel sent a letter to Plaintiff's counsel stating that Spain is "unaware of any physical evidence to date that would confirm that an 'Archangel Michael' shipwreck exists at the designated location" (Id.). The letter states further that:

> [T]he Government of Spain has not abandoned and does not authorize or consent to any disturbance or salvage by [Plaintiff] of any vessel or contents in which Spain has an interest...This letter is to insure that the record is clear that it remains the case that, to the extent that there is or may be a vessel or contents at the location(s) alleged by [Plaintiff] in which Spain has an interest, Spain rejects

3

and refuses salvage and has not consented to or approved of any disturbance of the seabed or other activity by [Plaintiff]. It remains Spain's understanding that any such activity requires approval by the State of Florida and Spain will be pleased to participate in consultations as regards any such permit application.

(Id.).

## DISCUSSION

This matter is before the Court on a motion for summary judgment in which Plaintiff seeks a salvage award and the exclusive right to salvage the alleged shipwreck. Plaintiff contends that it is entitled to these salvage rights as a matter of law because the existence of the *res* has been proven, Florida lacks jurisdiction over the *res*, and Spain has not appeared to assert any claim. Florida opposes the motion, arguing that Plaintiff has failed to establish that the *res* exists, Spain—while not admitting the *res* exists and not making an appearance—has stated in correspondence submitted by Plaintiff that it has not abandoned the alleged *res* and does not consent to salvage by Plaintiff, and Plaintiff will be unable to secure necessary State permits because the alleged wreck site is in a State preserve.

I.  Standard of Review

A movant is entitled to summary judgment only if the evidentiary materials on file demonstrate that there are no genuine issues as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (a) and (b); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250–51 (1986). A material fact is a fact that is identified by applicable substantive law as critical to the suit's outcome. Anderson, 477 U.S. at 248. A dispute about a "genuine" issue exists for summary judgment purposes "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The movant bears the burden of establishing the nonexistence of any genuine issue of material fact. Celotex, 477 U.S. at 322. To satisfy this burden, the movant must point to relevant excerpts from pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of genuine factual issues. Id. at 323. If there is any evidence in the record based upon any source from which a reasonable inference in a nonmoving party's favor may be drawn, a moving party cannot obtain a summary judgment. Celotex, 477 U.S. at 322.

II. The Law of Salvage

The law of salvage is primarily concerned with efforts to rescue vessels in distress. The opening paragraph of an oft-cited U.S. Supreme Court opinion describes salvage as "the compensation allowed to persons by whose voluntary assistance a ship at sea or her cargo or both have been saved in whole or in part from impending sea peril, or in recovering such property from actual peril or loss, as in cases of shipwreck, derelict, or recapture." The Sabine, 101 U.S. 384, 384 (1879). "Under the law of salvage, rescuers take possession of, but not title to, the distressed vessel and its contents. A court then fashions an appropriate award for the salvors' services." Int'l Aircraft Recovery v. Unidentified Wrecked & Abandoned Aircraft, 218 F.3d 1255, 1258 (11th Cir. 2000).

A valid salvage claim thus seeks conceptually to enforce a maritime lien and requires a showing of three elements: (1) there must be a marine peril placing the property at risk for loss, destruction, or deterioration; (2) the salvage service must be voluntarily rendered and not required by an existing duty or contract; and (3) the salvage efforts must be wholly or partially successful. Id.; Flagship Marine Servs. v. Belcher Towing, 966 F.2d 602, 605 (11th Cir. 1992). No valid salvage claim exists if any element is missing.

While it is undisputed that any efforts Plaintiff may have expended in its belief that an ancient shipwreck exists were voluntarily rendered and not required by an existing duty or contract, there are genuine issues of material fact concerning whether an alleged shipwreck subject to marine peril even exists and, in turn, whether Plaintiff's efforts in any way contributed to the successful salvage of any such shipwreck.

### A. Without Indisputable Evidence of a Shipwreck, Plaintiff Fails to Demonstrate That A Marine Peril Exists as a Matter of Law

In this Circuit, the element of marine peril may be satisfied by an "ancient, abandoned shipwreck." Treasure Salvors, Inc. v. Unidentified, Wrecked & Abandoned Sailing Vessel, 556 F.Supp. 1319, 1340 (S.D. Fla. 1983). Where such a shipwreck is allegedly involved, a salvaging company seeking salvage rights pertaining to the wreck typically provides comprehensive information about the ship, its cargo, dates, and other related information to allow the Court to make certain logical deductions as to the nature of the property being salvaged and the property's true owner. See, e.g., Cobb Coin Co., Inc., v. Unidentified, Wrecked & Abandoned Vessel, 549 F.Supp. 540, 545-48, 557 (S.D. Fla. 1982) (in a suit involving a wrecked Spanish galleon, findings of fact supported by extensive evidentiary materials presented at a bench trial "amply demonstrate that [a salvaging company] successfully saved property of considerable historic, archeological, and monetary value"); Treasure Salvors, Inc. v. Unidentified, Wrecked & Abandoned Sailing Vessel, 546 F.Supp. 919, 925 (S.D. Fla. 1981) (extending temporary injunctive order for company to pursue salvaging operations of a wrecked Spanish galleon and finding, in relevant part: "Using a confluence of factors for identification purposes, including the matching of certain items to the ship's manifest, [and] established archeological techniques to date the eras of time during which the various artifacts such as the swords, the sherds, the silver

6

coins and other items are dated, has resulted in what is solid evidence attesting that the wreck site area contains the remains of the [wrecked Spanish galleon *Nuestra Señora de] Atocha* and that some, if not all, of the artifacts derive from the *Atocha* through recovery from the scatter pattern emanating from her shallow-water resting site").

In stark contrast to the cases noted above, Plaintiff summarily asserts that it has "proved by [i]ts response to interrogatories that the salvage exists in the location set forth by the Plaintiff." (DE 61 at 4). The Court is not convinced. Indeed, since early on in this case, the Court has expressed concern about the lack of verifiable information concerning the actual existence and identity of the alleged wreck. To address this concern, the Court *sua sponte* issued interrogatories to Plaintiff aimed at securing reasonably available information about the nature of the wreck and Plaintiff's salvaging efforts to date (DE 56).

A review of Plaintiff's interrogatory responses (DE 57) raise more questions than answers. Rather than offer a cogent explanation for its belief as to the nature and identity of the wreck, Plaintiff offers a medley of vague and unsupported assertions. For example, Plaintiff refers to "secret" salvage records from Spain that Plaintiff claims to have but has not produced. Plaintiff also provides an artifact list and photographs but offers no information to authenticate when and from where the purported artifacts were recovered. While it is possible that a wine bottle recovered from the ocean floor may be linked to an ancient Spanish military frigate, as Plaintiff alleges, it is equally possible that the same wine bottle is merely the product of a navigator's use of the Dutchman's Log technique to measure speed or even simply tossed into the ocean from a passerby along the shore.

Confusing matters further is the haphazard collection of documents Plaintiff submits in support of its interrogatory responses. Plaintiff submits two single-page letters from 1981 and

7

1983, respectively, from the Bahamian Ministry of Transport to Plaintiff's President, that purport to verify salvage operations leading to the discovery of the *res*. A review of the letters, however, reveals nothing of significant import. The first letter, dated March 2, 1981, refers to prior communications about "the salvage operation [Plaintiff] believe[s] to be the Spanish Galleon, *Maravillas*" and confirms that Plaintiff is to bring "the coins and cannons to Nassau as agreed until such time a division is made" while requesting that Plaintiff provide "all information relevant to the *Maravillas* total value of the cargo, etc." The second letter, dated July 1, 1983, thanks Plaintiff's president "for the package of artifacts covering Governments share of your agreement." Notably, neither letter mentions the source of the artifacts mentioned or the circumstances surrounding their recovery.

Plaintiff also submits a one-page letter written in Spanish that appears to be from Spain's Ministry of Education, Culture and Sport. The letter is dated December 5, 2000, but the Court cannot verify the letter's contents as no certified translation has been provided. Lastly, Plaintiff submits a two-page affidavit, dated August 20, 1993, by a Jupiter resident named Gene Chevalier—a self-described "salvor and treasure hunter" since 1932—who claims, among other things, to have recovered artifacts during a dive off the Jupiter shore that "are clearly marked in the 1650's with the possibility of being *Maravillas* salvage vessels, according to Seville Archive documentations" (DE 57 at 16). Mr. Chevalier states further that he donated "items, artifacts, and the shipwreck locations and pictures of my history, which predates Castro's Cuba, Manalapan, Juno/Jupiter, Palm Beach, Bahamas, Marquessas Keys, and Florida" to Plaintiff (Id. at 16-17). Notably absent from the affidavit is the date on which any dive took place or any precise location or locations from which any artifacts mentioned were recovered.

Needless to say, the validity of Plaintiff's salvaging research and conclusions is highly debatable at this juncture in the proceedings. It has become readily apparent that Plaintiff is unable to demonstrate—by reference to indisputable evidentiary materials on file—that a salvageable wreck exists at the designated location. Without such showing, Plaintiff fails to establish the necessary element of a marine peril as a matter of law.

B. *Without Indisputable Evidence of Artifacts Recovered from the Designated Wreck Site, Plaintiff Fails to Demonstrate Salvage Success as a Matter of Law*

It is axiomatic that success is a prerequisite to earning a salvage award. The Blackwall, 77 U.S. 1, 12 (1869) ("Success is essential to the claim."). In the case of an alleged shipwreck, such success can be shown by bringing before the Court some portion of the *res* or fruit of the salvage operation. Cobb Coin, 549 F.Supp. at 557.

Here, as discussed more fully above, Plaintiff presents no evidence from which the Court could conclude that anything of value or historical significance actually exists where Plaintiff claims it exists. Plaintiff has offered no authority, and the Court is unaware of any, in which a court granted salvage rights pertaining to a historic wreck as a matter of summary judgment to a potential salvor who offers no evidence in the way of tangible artifacts linked in some fashion to the alleged historic wreck. At most, the undisputed evidence before the Court establishes that Plaintiff may have voluntarily undertaken efforts to salvage what it believes to be an ancient Spanish shipwreck at a designated site. Plaintiff's belief alone, unsupported by tangible undisputed evidence, is insufficient to establish salvaging success as a matter of law.

III.   A Vessel Owner's Right to Refuse Salvage

In addition to the foregoing, and of special import in this case, is the well-established rule that salvage cannot be forced upon the owner of a vessel; "a salvor who acts without the express

or implied consent of the owner is a gratuitous intermeddler, who is not entitled to any salvage award." Int'l Aircraft Recovery, 218 F.3d at 1262; Thomas J. Schoenbaum, Admiralty & Maritime Law § 16-1 (5th ed. 2012). Indeed, one admiralty treatise addressing salvage claims pertaining to historic shipwrecks states that "[o]nly in a rare case where the governmental owner gives express or implied consent to salvage, should an award be given because the government has full power to reject or prohibit the services." Admiralty & Maritime Law at § 16-7 (footnote omitted).

Here, there is evidence in the record to suggest that Spain—the alleged owner of the *res* according to Plaintiff—has expressly refused any salvage activity by Plaintiff. To be sure, Spain's legal counsel has unequivocally stated in December 2012 correspondence to Plaintiff that Spain "does not authorize or consent to any disturbance or salvage by [Plaintiff] of any vessel or contents in which Spain has an interest. . .[and] to the extent that there is or may be a vessel or contents at the location(s) alleged by [Plaintiff] in which Spain has an interest, Spain rejects and refuses salvage and has not consented to or approved of any disturbance of the seabed or other activity by [Plaintiff]." (DE 42-1). As further evidence of refusal, an affidavit by Spain's counsel signed earlier this year states that Plaintiff is "not authorized to disturb or conduct salvage on any sunken vessel in which the Kingdom of Spain has an interest and that the Kingdom of Spain has not abandoned any and all such interests…" (DE 20-1 at 2). Counsel goes on to aver that he has "no reason to believe that the *res* purportedly claimed in this case actually exists. I have therefore not filed a Verified Claim on behalf of Spain in this case." (Id.). While Spain has not formally appeared or otherwise made any claim in this case, the Court would be remiss in disregarding this record evidence in evaluating Plaintiff's motion for summary judgment. See, e.g., Int'l Aircraft Recovery, 218 F.3d at 1261 (reversing entry of summary

10

judgment for a salvor seeking salvage rights to a sunken Navy torpedo bomber in part because the court below "under-appreciated the authority of a vessel's owner to prevent others from interfering with its property").

Whether Spain has effectively refused Plaintiff's salvaging services will depend on factual determinations concerning the existence and nature of the wreck. Such factual determinations can only be properly made at a trial and not as a matter of summary judgment.

## CONCLUSION

The foregoing analysis leads the Court to the inescapable conclusion that Plaintiff is not entitled to the salvage rights it seeks as a matter of summary judgment. To claim a discovery of a wrecked Spanish military warship from centuries ago without the presentation of indisputable evidence to establish that the wreck exists or, if it exists, that the wreck's owner has not refused salvage is simply insufficient to support the entry of summary judgment. Accordingly, the Court ORDERS that Plaintiff's Motion for Summary Judgment (DE 61) is DENIED.

The Court further ORDERS Plaintiff to confer with all interested parties and file a status report by November 18, 2013, with a proposed date for a bench trial to be set in this matter.

DONE and ORDERED in Chambers at West Palm Beach in the Southern District of Florida, this 28th day of October, 2013.

_____
DAVE LEE BRANNON
U.S. MAGISTRATE JUDGE